Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

MARTIN O'BRIEN AND JAMES MANNING, :

            Plaintiffs,     :

      - against -     :

NICE SYSTEMS INC. and NICE    :
SYSTEMS LTD.,

                    :

           Defendants.    :

                    :

- - - - - - - - - - - - - - - - x

**JUDGE CROTTY**

**07 CIV 9582**

**COMPLAINT AND JURY DEMAND**

**JURY TRIAL DEMANDED**

## NATURE OF THE ACTION AND THE PARTIES

1.   This is an action to redress unlawful discrimination based on religion, creed, race, color, national origin, and age, unlawful harassment, unlawful retaliation, and unlawful employment practices, under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, as amended ("Section 1981"), 42 U.S.C. § 1981 *et seq.*, the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, the New York City Human Rights Law, (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, the Age Discrimination in Employment Act of 1967, as amended (the

"ADEA"), 29 U.S.C. § 621 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 et seq.

2.    Plaintiff Martin O'Brien ("Mr. O'Brien") is an adult male citizen of the United States, residing in Setauket, Suffolk County, New York.

3.    Plaintiff James Manning ("Mr. Manning") is an adult male citizen of the United States, residing in Setauket, Suffolk County, New York.

4.    Defendant NICE Systems Inc. is a corporation incorporated under the laws of the state of Delaware.  According to NICE Systems Inc., it has a New York office located at 116 John Street, New York, New York 10038-3300, it does business in New York City, and it is authorized to do business in New York State.  In addition, according to NICE Systems Inc., it also has a corporate office and/or a principal place of business located at 301 Route 17 North, 10th Floor, Rutherford, New Jersey 07070.

5.    Upon information and belief, Defendant NICE Systems Ltd. is an Israeli corporation, has a corporate office and/or a principal place of business in Israel and at 301 Route 17 North, 10th Floor, Rutherford, New Jersey 07070, has employees based in the United States, does business in the United States including, among other items, in New York and New York City, and purports to be the corporate parent company of NICE Systems Inc.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over Plaintiffs' claims pursuant to Title VII, 42 U.S.C. § 2000e-5(f) U.S.C., Section 1981, 42 U.S.C. § 1981, 1981a, 1988, 28 U.S.C. §§ 1331, 1343, 1367(a) and 2201, and the ADEA, 29 U.S.C. §§ 216(b), 626(b) to (d).

7.    Venue is proper in this district pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. § 1391, and the ADEA, 29 U.S.C. §§ 216(b), 626(b) to (d).

8.    In May 2007, each Plaintiff filed a timely charge of discrimination, harassment and retaliation against NICE Systems Inc. with the United States Equal Employment Opportunity Commission ("EEOC").  In August 2007, the EEOC issued a Notice Of Right To Sue to each Plaintiff regarding their EEOC Charges against NICE Systems Inc., which each Plaintiff received thereafter.  Upon information and belief, NICE Systems Ltd. was fully aware of the filing of Plaintiffs' May 2007 EEOC Charges.

9.    In October 2007, each Plaintiff filed a timely charge of discrimination, harassment and retaliation against NICE Systems Ltd. with the United States Equal Employment Opportunity Commission ("EEOC").  In October 2007, the EEOC issued a Notice Of Right To Sue to each Plaintiff regarding their EEOC Charges against NICE Systems Ltd., which each Plaintiff then received.

10.  Plaintiffs have mailed a copy of this Complaint to the New York City Commission Of Human Rights and the New York City Corporation Counsel.

11.  Plaintiffs have satisfied all of the statutory prerequisites to filing this action with this Court.

12.  Each Plaintiff seeks an award of appropriate relief.

### FACTS

#### A.    Introduction – The Business of NICE Systems

13.  Defendants operate under a single global brand name "NICE Systems" have a web site for the global operations of NICE Systems at www.nice.com.  Defendants are individually and collectively referred to herein as "NICE Systems."

14.  Defendants' web site describes the global business as follows: "NICE Systems is the leading provider of Insight from Interactions™, offering comprehensive performance management and interaction analytics solutions for the enterprise and public safety and security markets...NICE has over 24,000 customers in 100 countries, including over 85 of the Fortune 100 companies."

15.  Defendants' web site also states that NICE Systems has "Corporate headquarters in Israel with offices around the world" and "more than 600 support professionals and 140 service partners around the world."  Thus, NICE Systems operates under a single global brand name and maintains offices throughout the world.

16.   Defendants' web site also states that NICE Systems has "global management" and policies applicable to all of its offices throughout the world, including among other items "A Code of Ethics and Business Conduct."

17.   Defendants' web site indicates that the "global management" team of NICE Systems is predominantly Jewish and/or Israeli, http://www.nice.com/about/corporate_management.php.

18.   As discussed below, Defendants unlawfully discriminated against Plaintiffs regarding compensation, terms, conditions and privileges of employment, and employment opportunities, unlawfully harassed them, and unlawfully discharged them, because of their religion, creed, race, color, national origin and age, and unlawfully retaliated against them because they opposed, objected to and complained of discrimination.  Defendants engaged in a continuing violation of law.  Defendants' proffered reason for their conduct was a pretext for unlawful discrimination, unlawful discharge and unlawful retaliation.

19.   Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled and/or coerced the unlawful conduct alleged herein.

20.   Defendants are jointly and severally liable for the unlawful conduct alleged herein.

21.   Defendants' liability for the unlawful conduct alleged herein is based upon Defendants' unlawful conduct, applicable

law, and various legal doctrines, including without limitation, single employer doctrine, alter ego, respondeat superior, joint employer doctrine, and other grounds.  Upon information and belief, NICE Systems Inc. and NICE Systems Ltd. are alter egos and instrumentalities of each other.  NICE Systems Ltd., the alleged corporate parent of NICE Systems Inc., allegedly controls various aspects of NICE Systems Inc.  Accordingly, NICE Systems Ltd. is liable for unlawful conduct of NICE Systems Inc. herein.

22.  In July 2007, NICE Systems filed a position statement with EEOC, which NICE Systems raised allegations that implicate NICE Systems Ltd. for the unlawful conduct alleged herein.

### B.   NICE Systems Recruited Plaintiffs In The 1990s

23.  In the mid-1990s, NICE Systems recruited and hired Plaintiffs because they are experienced salespersons/managers with outstanding track records and established customer relationships, and NICE Systems wanted to take advantage of same to build its business.

24.  Plaintiffs joined NICE Systems and, over the next ten years, Plaintiffs substantially grew the business of NICE Systems, only to be unlawfully discharged in January 2007 because of their religion, creed, race, color, national origin and age, and in retaliation for their protected activities.

25.  Plaintiffs' job performance at NICE Systems was outstanding.  At all times, Defendants were fully aware of same.

### C.  **Mr. O'Brien's Outstanding Performance**

26.  Mr. O'Brien is an adult male, born August 7, 1964.  Mr. O'Brien's race is Caucasian.  He was born in the United States. He is of Irish descent.  His religion is Catholic.

27.  Mr. O'Brien was employed by NICE Systems from 1996 through January 10, 2007, when he was unlawfully discharged from his employment.

28.  At all relevant times, Mr. O'Brien was qualified for his position with NICE Systems and performed his job duties in a manner most satisfactory to NICE Systems.

29.  In fact, Mr. O'Brien's job performance was outstanding.

30.  In 1993, Mr. O'Brien left a five-year career at Lanier Worldwide to work for Stevens Communications, a new and one of the first distributors of NICE Systems.  Mr. O'Brien brought many accounts to Stevens, including among others, Waterhouse Securities, Mitsubishi Bank, Paine Webber and Shearson Lehman. During Mr. O'Brien's employment with Stevens, he pioneered NICE's sale of recording equipment to the financial markets in New York City.  He was very successful working as a dealer of NICE products and he introduced the top executives of NICE Systems to many large clients and business partners.

31.  In 1996, NICE Systems recruited Mr. O'Brien to leave Stevens and hired him as Major Accounts Sales Manager.

32.  In that position, Mr. O'Brien generated substantial

revenue for NICE Systems, including in the financial markets, securing new clients for NICE Systems products and services, including among others, Credit Suisse and Swiss Bank. He led NICE Systems in the penetration of the "call center market", securing new clients for products and services, including among others, Progressive, Teletech, ADT, and Ameritech. He developed NICE Systems' first National Account Team and he was an integral part in NICE Systems' acquisition of the firm IBS.

33. As of 2000, Mr. O'Brien was a Senior Director, managing a team of about 12 employees. Over the coming years, Mr. O'Brien's job performance continued to be outstanding. His sales team was the most successful team in NICE Systems, and generated about one-third of NICE Systems' sales revenue in North America.

34. In 2005, Mr. O'Brien's job performance was outstanding. In that year, Mr. O'Brien achieved 142% of his revenue goals and achieved $17,400,000 in sales, which represented about 25%-33% of NICE Systems' entire North American sales revenue. Mr. O'Brien achieved this milestone with only two employees on his sales team for most of the year. Under Mr. O'Brien's leadership, his team secured numerous clients, including JP Morgan Chase, MBNA and General Electric.

35. In 2006, Mr. O'Brien's job performance was outstanding. Mr. O'Brien achieved 104% of his revenue goals and, under his leadership, his team generated more than $23,000,000.00 in

revenue.  If "maintenance" is included, under Mr. O'Brien's leadership, his team generated more than $30,000,000.00 in revenue.  In any event, under Mr. O'Brien's leadership, his team generated sales revenue that accounted for about 25%-33% of NICE Systems' entire North American sales revenue.

36.  During Mr. O'Brien's employment, he was repeatedly awarded membership in NICE Systems' "President's Club" which was an acknowledgment of his outstanding job performance.  Such "membership" generally included a fully paid vacation.

### D.  **Mr. Manning Outstanding Performance**

37.  Mr. Manning is an adult male, born September 30, 1963.  Mr. Manning's race is Caucasian.  He was born in the United States.  He is of Irish descent.  His religion is Catholic.

38.  Mr. Manning was employed by NICE Systems from September 1997 through January 10, 2007, when he was unlawfully discharged from his employment.

39.  At all relevant times, Mr. Manning was qualified for his position with NICE Systems and performed his job duties in a manner most satisfactory to NICE Systems.

40.  In fact, Mr. Manning's job performance was outstanding.

41.  Prior to joining NICE Systems, Mr. Manning had spent ten years working for Lanier Worldwide, rising to the position of North East Regional Sales Manager for Voice Recording.

42.  In 1997, NICE Systems recruited Mr. Manning away from

Lanier and hired him as Eastern Regional Sales Manager ("RSM").
Upon information and belief, the decision to hire Mr. Manning was
made by Ted Mooney (American) then VP of Sales and Hanan Miron
(Jewish and/or Israeli) then General Manager, NICE Systems Inc.

43.   In that position, Mr. Manning's job performance was
outstanding.  He secured many new clients for NICE Systems,
including among others, Fedex and Fedex Custom Critical, Electric
Insurance, Equitable AXA and Private Healthcare Systems ("PHCS").
Mr. Manning had prior relationships with these accounts, which
NICE Systems knew when it recruited and hired him.  In 1998, NICE
Systems, by Hanan Miron, gave Mr. Manning the Award for Highest
Sales Revenue.  Louis Champin (then VP of Sales) and Morgan
Sturdy (then President, NICE Systems Inc.), told Mr. Manning that
his career was on the rise.  In that position, Mr. Manning also
managed distributors, dealers and resellers of NICE Systems
products and services.

44.   From 2000 forward, Mr. Manning's job performance was
outstanding.  Mr. Manning repeatedly exceeded his goals and
earned "President's Club" membership at least four times.

45.   In 2000, NICE Systems promoted Mr. Manning to RSM/Sales
Director for the East.  Mr. Manning's job performance in that
position was outstanding.  He managed and led a team of about
five to six employees, securing business with, among others, MFS
Mutual Funds ("MFS"), T-Rowe Price, Time Warner, Sun Life and

Mellon Financial.  In addition, Mr. Manning directed, managed and assisted his sales representative at PRC and Home Depot, both of which are now clients of NICE Systems.

46.  In or about January 2003, NICE Systems transferred Mr. Manning to Sales Director of the Financial Trading Team, initially managing a team of about four employees.  Mr. Manning's job performance in that position was outstanding.  Under Mr. Manning's leadership, NICE Systems secured numerous clients including, among others, HSBC, Williams Energy, Bear Stearns and CIBC.  In addition, Mr. Manning successfully managed client relationships, including with Citibank, Deutsche Bank, and UBS for financial trading.  Mr. Manning also secured Royal Bank of Canada as Sales Director of the Financial Trading Team.  Under Mr. Manning's leadership as Sales Director of the Financial Trading Floor Team, the team secured those accounts and others.  In that position, Mr. Manning also managed distributors, dealers and resellers of NICE Systems products and services.

47.  Mr. Manning's job performance in 2005 was outstanding.  In 2005, Mr. Manning achieved 109% of his goals and earned "President's Club" membership.

48.  Mr. Manning's job performance in 2006 was outstanding.  Under Mr. Manning's leadership, in 2006, his team achieved 119% of the annual quota (achieving "President's Club" membership).  Mr. Manning's team also secured business for NICE Systems'

Compliance Suite of applications which was a major initiative according to Haim Shani, CEO of Nice Systems Ltd.

### E.    **Examples Of Defendant's Unlawful Conduct 2001-2006**

49.    During Plaintiffs' employment, they were repeatedly harassed and discriminated against based on their race, color, national origin and religion/creed.  The conduct included, among other items, harassing and discriminatory statements and epithets, all of which were unwelcome, offensive and against Plaintiffs' will and over their objections and complaints, and unlawful denial of compensation, terms, conditions and privileges of employment, promotions and employment opportunities.

50.    During Plaintiffs' employment, NICE Systems engaged in a continuing violation of law and a pattern and practice of hiring, retaining, promoting and according favorable treatment to persons/employees that are Jewish and/or Israeli.  NICE Systems repeatedly hired, retained, promoted and protected unqualified and less qualified persons/employees because they are Jewish and/or Israeli, and denied such employment opportunities to more qualified persons who are non-Jewish and/or non-Israeli.

51.    In numerous instances, NICE Systems discriminated against Plaintiffs and unlawfully denied them promotions, advancement, and other opportunities, because they are not Jewish and they are not Israeli.  NICE Systems promoted Jewish and/or Israeli persons without any application process.  Plaintiffs

advised NICE Systems of their desire for promotion and applied for promotions, but were unlawfully denied same.

52.  NICE Systems discriminated against Plaintiffs' co-workers that are non-Jewish and non-Israeli. NICE Systems pressured Plaintiffs to hire unqualified employees who are Jewish and Israeli.  Plaintiffs opposed, objected to and complained about same.  NICE Systems retaliated against them for doing so.

53.  The discrimination and harassment was severe and pervasive, adversely affected the terms, conditions and privileges of Plaintiffs' employment, resulted in adverse tangible employment actions, and created a hostile, offensive and abusive work environment.

54.  Plaintiffs opposed, objected to and complained about the conduct.  However, NICE Systems failed to take appropriate remedial action and failed to put an end to the unlawful conduct and it continued throughout Plaintiffs' employment.  NICE Systems retaliated against Plaintiffs for objecting to, opposing and/or complaining about unlawful discrimination and harassment.

55.  From at least 2001 forward, NICE Systems repeatedly discriminated against Plaintiffs because of their religion, creed, race, color and national origin, and retaliated against them for engaging in protected activities.

56.  From at least 2001 forward, NICE Systems hired and/or promoted less qualified employees ahead of Plaintiffs, because

-13-

those less qualified employees are Jewish and/or Israeli.  From at least 2001 forward, NICE Systems repeatedly unlawfully denied Plaintiffs positions for which they were fully qualified, causing them to suffer damages, because of their religion, creed, race, color and national origin, and their protected activities.

57.  In 2001, NICE Systems hired Haim Shani as CEO of the global operation.  Thereafter, NICE hired Shlomo Shamir to be the CEO of NICE Systems Inc.  According to NICE's website, Mr. Shani is currently Chief Executive Officer, NICE Systems Ltd. and Mr. Shamir is currently President of NICE Systems Ltd.  Mr. Shani and Mr. Shamir are Jewish and/or Israeli.

58.  Mr. Shani and Mr. Shamir sought to retain Mr. O'Brien because of the substantial value that Mr. O'Brien brought to NICE Systems.  To induce Mr. O'Brien to stay with NICE Systems, they assigned Mr. O'Brien stock options.

59.  In 2001, NICE Systems had an available position, VP of Sales (Voice Division), Nice Systems Inc.  Mr. O'Brien and Mr. Manning each applied for this position and were fully qualified for same.  NICE Systems, by Mr. Shamir (then CEO of NICE Systems Inc.), hired Ian Ehrenberg, a less qualified individual who is Jewish.  NICE Systems unlawfully denied Mr. O'Brien and Mr. Manning this position because of their religion/creed and Irish-Catholic heritage.

60.  For about three years, Mr. Ehrenberg was VP of Sales

-14-

and Plaintiffs' direct supervisor.

61. Mr. Ehrenberg discriminated against Plaintiffs and made discriminatory comments about them. For example, Mr. Ehrenberg told Plaintiffs on a management conference call to "back up my Potato truck", which was an epithet referring, among other items, to Plaintiffs' Irish-Catholic heritage and their religion/creed.

62. During Mr. O'Brien's many years at NICE Systems, various employees, including among others, Mr. Ehrenberg, Chris Daniels (Jewish), told Mr. O'Brien that he had the "wrong last name", meaning that his race, color, national origin, and religion/creed would prevent him from having a long term and successful career at NICE Systems.

63. Mr. Ehrenberg did not want Plaintiffs to succeed because of his discriminatory animus towards them and, as Plaintiffs' supervisor, he actively discriminated against them.

64. For example, Mr. Ehrenberg raised Mr. O'Brien's goals to improper levels, to create the false impression that he was underperforming. In addition, Mr. Ehrenberg reduced the size of Mr. O'Brien's team and territory. Mr. Ehrenberg also sought to prevent Mr. O'Brien from achieving "President's Club" membership. Notwithstanding Mr. Ehrenberg's unlawful conduct, Mr. O'Brien's job performance was outstanding.

65. Mr. Ehrenberg did not want Mr. Manning to succeed. Notwithstanding Mr. Ehrenberg's unlawful conduct, as noted above,

Mr. Manning's job performance was outstanding.  In fact, as noted above, during the period that Mr. Manning reported to Mr. Ehrenberg, Mr. Manning managed and led a team of about five to six employees, securing business with, among others, MFS, T-Rowe Price, Time Warner, Sun Life and Mellon Financial.  In addition, Mr. Manning directed, managed and assisted his sales representative at PRC and Home Depot, both of which are now clients of NICE Systems.

66.  Mr. Ehrenberg is incompetent.  He lacked the knowledge, skills and experience to secure new business in the voice recording solution market.  In fact, NICE Systems received numerous complaints from customers about Mr. Ehrenberg, including among others, from IPC, BT and Etrali, NICE Systems' largest global resellers for Trading Floor sales.  Mary Sullivan Gleeson, a NICE Systems employee and relationship manager to IPC and BT, told Mr. Mannning that IPC would cease doing business with NICE Systems if Mr. Ehrenberg remained as the liaison to IPC.

67.  NICE Systems should have discharged Mr. Ehrenberg because he was incompetent, he was the reason for many complaints, and he had made discriminatory comments.  However, NICE Systems retained and protected him for years because of his religion/creed.

68.  In 2001, Mr. O'Brien had an available sales representative position on his team.  NICE Systems wanted Mr.

O'Brien to hire Michael Rubinoff because he is Jewish and/or Israeli. Mr. O'Brien declined to hire Mr. Rubinoff because he was unqualified. NICE Systems then hired Mr. Rubinoff for a different position, Business Development Manager, to manage the IBM relationship. He was unqualified for that position. NICE Systems also promoted him to Director of Marketing, Video Division. NICE Systems subsequently retaliated against Mr. O'Brien.

69. As noted above, in January 2003, NICE Systems transferred Mr. Manning to Sales Director of the Financial Trading Team. Mr. Ehrenberg had previously had this responsibility, but NICE Systems removed that responsibility from Mr. Ehrenberg, apparently because of his incompetence and the numerous complaints received about him. However, NICE Systems nevertheless retained and protected Mr. Ehrenberg, because he is Jewish.

70. In 2004, NICE Systems transferred Mr. Ehrenberg to the position of General Manager, Video Division. At the same time, NICE Systems transferred Jacob Fox from the position of General Manager, Video Division, to VP of Sales, Voice Division. Thus, NICE Systems essentially swapped the positions of Mr. Ehrenberg and Mr. Fox. In 2004, NICE Systems hired Yochai Rozenblat as the new VP of Sales of NICE Systems Inc. He and Mr. Rozenblat shared the management responsibilities.

-17-

71. Mr. Fox and Mr. Rozenblat are both Jewish and/or Israeli. Each Plaintiff was more qualified than Mr. Fox and Mr. Rozenblat for their positions. In fact, neither Mr. Fox nor Mr. Rozenblat had any relevant experience. Mr. Rozenblat told Plaintiffs that he was raised on a Kibbutz, served in the Israeli military, and attended college and law school in Tel Aviv. He said that he worked as a limousine driver, ran Raves on the beach in Israel, and imported roller blades. None of that was relevant to NICE Systems' business. Mr. Rozenblat told Plaintiffs that he had only three years of business experience in the United States. Each Plaintiff had many more years of experience. Mr. Rozenblat has poor communication skills in English. Clearly then, each Plaintiff was more qualified than him. NICE Systems knew that each Plaintiff wanted the positions given to Mr. Fox and Mr. Rozenblat. However, NICE Systems unlawfully denied Plaintiffs the positions because of their race, color, national origin and religion/creed.

72. In 2004, Mr. Manning had a meeting with Haim Shani (Jewish and/or Israeli), then CEO of NICE Systems Ltd., at Bear Stearns. They discussed Mr. Manning's carrier and the current management team in North America (Mr. Ehrenberg and Mr. Shamir). Mr. Shani praised Mr. Manning and told him that Mr. Ehrenberg and Mr. Shamir could not lead NICE Systems into the future and that neither Mr. Ehrenberg nor Mr. Shamir have the skill sets to sell

the advanced solutions.

73.  In or about 2005, Mr. O'Brien had an available position on his team.  NICE Systems wanted Mr. O'Brien to hire Lemore Michnai, an employee in the human resources department, because she is Jewish and/or Israeli.  Mr. O'Brien declined to hire her because she was unqualified.  NICE Systems subsequently retaliated against Mr. O'Brien.

74.  In or about 2005, Mr. O'Brien had a one on one breakfast meeting with Mr. Haim Shani, then CEO of NICE Systems Ltd.  Mr. Shani admitted to Mr. O'Brien that Mr. Ehrenberg's performance had been poor and that NICE Systems had transferred Mr. Ehrenberg to an easier job in a division where the products were simpler and easier to sell.  Thus, NICE Systems retained and protected Mr. Ehrenberg because he is Jewish.

75.  In 2005, NICE Systems transferred Mr. Shamir from CEO, Nice Systems Inc., to President, NICE Systems Ltd.  NICE Systems then hired Eran Gorev for the position of CEO, NICE Systems Inc. According to NICE Systems' website, Mr. Gorev is currently President and CEO, NICE Systems Inc.  Mr. Gorev was unqualified for the position.  In fact, NICE Systems hired Mr. Gorev because he is Jewish and/or Israeli.  He had no relevant experience. According to Mr. Gorev, he had attended law school in Tel Aviv and had worked as a software engineer.  Each Plaintiff was more qualified than Mr. Gorev for the position of CEO, NICE Systems

Inc.  However, NICE Systems unlawfully denied Plaintiffs that
position because of their race, color, national origin and
religion/creed.

76.  In or about February 2005, Plaintiffs attended a
meeting with Mr. Gorev in Houston, Texas.  Mr. Gorev called
Plaintiffs "whores", which was part of the ongoing
discrimination, harassment and retaliation against Plaintiffs.

77.  Thereafter, Mr. Gorev promoted Sara Lieberman from
sales engineering to sales representative, and assigned her the
American Express client account.  NICE Systems promoted Ms.
Lieberman because she is Jewish and/or Israeli.  Plaintiffs have
a photograph of various NICE Systems employees sitting together,
including Ms. Lieberman and Mr. Gorev.  Each Plaintiff was more
qualified than Ms. Lieberman to handle the American Express
client account.  However, NICE Systems unlawfully denied
Plaintiffs this account because of their race, color, national
origin and religion/creed.  NICE Systems assigned Ms. Lieberman
to Julie Rupp's team.  NICE Systems retained Ms. Rupp because she
did not object, oppose or complain about having unqualified
Jewish and/or Israeli employees on her team, such as Ms.
Lieberman.

78.  In late 2005, NICE Systems hired Chris Daniels (Jewish)
as VP of Global Accounts including Deutsche Bank, Citibank and
UBS.  Upon information and belief, Mr. Daniels is also younger

than both Plaintiffs.  Mr. Manning had responsibilities for those accounts with respect to the trading floor business.  Mr. Manning was more qualified than Mr. Daniels for the position.  However, NICE Systems unlawfully denied Mr. Manning that position because of his race, color, national origin, religion/creed and age.

79.  NICE Systems also promoted Gabby Koran (Jewish, Israeli) to VP of Sales for APAC after being the Sales Director of NICE Systems Inc. (CALA region). Ms. Koran was based out of New Jersey.  Mr. Manning was more qualified than Ms. Koran for that position.  However, NICE Systems unlawfully denied Mr. Manning that position because of his race, color, national origin, and religion/creed.

80.  In 2006, NICE Systems induced Mr. O'Brien to continue his employment by telling him that he was being promoted to VP of Financial Services Accounts and by telling him that he was being assigned 7,000 stock options on a four-year vesting schedule.  It was Mr. O'Brien's understanding that by its actions, NICE Systems was representing to him that his job was secure for at least four more years.  As discussed below, NICE Systems' actions were fraudulent because, among other items, NICE Systems was already planning to unlawfully terminate Mr. O'Brien's employment before any of the purported stock options would vest.

81.  In 2006, NICE Systems promoted several persons to Regional VP, but denied Mr. Manning a promotion because of his

race, color, national origin and religion/creed.  Mr. Rozenblat alleged that NICE Systems was denying Mr. Manning a promotion because Mr. Manning had not yet sold call centers.  Mr. Rozenblat's explanation made no sense and was a pretext for unlawful conduct.  Mr. Manning already had about 15 years of experience selling such items.

82.  In 2006, NICE Systems assigned Mr. Manning a "personal" goal and six competitive accounts to sell to.  This was in addition to Mr. Manning's regular, full time duties of managing the Financial Trading Floor business.  NICE Systems amended Mr. Manning's 2006 compensation from 100% team attainment, to 60% team and 40% personal attainment.  This was intended to constitute, and did constitute, a reduction in earnings and managerial responsibility.  Mr. Manning complained to Mr. Rozenblat that NICE Systems was trying to coerce him to resign. Mr. Rozenblat did not take remedial action in response to Mr. Manning's complaint.  Mr. Manning requested a copy of his NICE Systems personnel file.  The file was not provided to him and Mr. Gorev threatened to fire Mr. Manning for making that request.

83.  In or about mid 2006, Plaintiffs earned "President's Club" membership and a fully paid vacation to Grand Cayman.  On that trip, NICE Systems discriminated against the non-Jewish and non-Israeli employees awarded such "membership" by, among other items, intentionally assigning them less desirable hotel rooms.

84.    In late October 2006, Mr. Manning attended a sales management meeting in New Jersey during which NICE Systems discussed creation of a new position - Director of Distributor/Indirect Sales.  Mr. Manning told Mr. Rozenblat that he wanted to be considered for that position.  Mr. Rozenblat unlawfully denied Mr. Manning that position because of his race, color, national origin and religion/creed.  Upon information, NICE Systems filled the position with Alon Klomak, an unqualified or less qualified person who is Jewish and/or Israeli.

### F.    Defendant's Unlawful Termination Of Plaintiffs' Employment In 2007 And Subsequent Conduct

85.    In 2007, NICE Systems' unlawful conduct against Plaintiffs culminated with the unlawful termination of Plaintiffs' employment on January 10, 2007.

86.    From approximately January 1, 2007 through January 5, 2007, Mr. O'Brien took vacation.

87.    On Monday, January 8, 2007, Mr. O'Brien traveled to Las Vegas and made a sales presentation to Citigroup.  Upon information and belief, this was the largest potential deal ever pitched by NICE Systems and he had been working on that deal for several years.

88.    On January 10, 2007, Mr. O'Brien was scheduled to meet with Eran Gorev (CEO, NICE Systems Inc.) at NICE Systems' New Jersey office, to discuss the Citigroup business opportunity.

Mr. Gorev postponed that meeting.  Mr. O'Brien then attended a scheduled sales management meeting in NICE Systems' New Jersey office, during which Company management summoned Mr. O'Brien to a separate meeting with Mr. Rozenblatt, Mr. Gorev and Janet Ginsberg, Vice President, Human Resources (Jewish).

89.  At that time, NICE Systems told Mr. O'Brien that he was being laid off as part of a restructuring and that they had planned to separate him from NICE Systems for more than one year. NICE Systems did not allege that Mr. O'Brien was being terminated for performance reasons and offered Mr. O'Brien a severance package in exchange for a release of claims.

90.  Ms. Ginsberg demanded Mr. O'Brien's personal computer and Blackberry.  She threatened to physically assault Mr. O'Brien and take his Blackberry if he declined to return it to her.  NICE Systems called the police and continued to threaten Mr. O'Brien. The police came to NICE Systems.  At all times, Mr. O'Brien acted professionally and lawfully.  Mr. O'Brien did nothing wrong and returned the personal computer and Blackberry to NICE Systems.

91.  On January 10, 2007, Mr. Manning, like Mr. O'Brien, attended a scheduled sales management meeting in NICE Systems' New Jersey office.  During that meeting, Company management summoned Mr. Manning to a separate meeting with Mr. Rozenblat, Mr. Gorev, Eran and Shoshie Kaufman, Human Resources (Jewish and/or Israeli).

-24-

92.  At that time, NICE Systems told Mr. Manning that he was being laid off as part of a restructuring.  NICE Systems did not allege that Mr. Manning was being terminated for performance reasons and offered Mr. Manning a severance package in exchange for a release of claims.

93.  NICE Systems did not terminate Plaintiffs for poor job performance and did not terminate them for cause.

94.  At the time each Plaintiff was unlawfully discharged, each Plaintiff asked Mr. Gorev if there was any other position he could fill.  Mr. Gorev told each Plaintiff that he was not qualified for any other job at NICE Systems and that all other jobs were filled.

95.  NICE Systems terminated each Plaintiff because of his race, color, national origin, religion/creed and age.  Mr. Gorev tried to cover up the unlawful conduct, telling Plaintiffs that they were not the only employees let go.  He said NICE Systems laid off Jacob Fox (Jewish and/or Israeli).  Mr. Gorev lied.

96.  Upon information and belief, Mr. Fox had obtained new employment prior to his last day with NICE Systems.  Indeed, after Mr. Fox separated from NICE Systems, he immediately became President and CEO of PineApp Americas, a company headquartered in Israel at PineApp Ltd., 8 Hata'asia street, Nesher, Israel, 36601, Tel: +972-4-8212321, Fax: +972-4-8203676, Email: info@pineapp.com.  Upon information and belief, Mr. Fox either

-25-

resigned from NICE Systems to accept this new position or NICE Systems had given Mr. Fox advance notice of his layoff. In either event, Mr. Fox's separation from NICE Systems was different from Plaintiffs' circumstances. Moreover, it was Plaintiffs' understanding that NICE Systems reassigned Mr. Fox's job duties to others months before his formal separation date and upon information and belief, Mr. Fox had actually relocated to Southern California, where PineApp is based, months before his formal separation date with NICE Systems.

97.  The PineApp website describes its business as follows:"PineApp, a leader in securing networks and email systems, offers comprehensive appliance solutions for small, medium and large organizations."
(http://www.pineapp.com/company.php?profile).

98.  The PineApp website contains a February 2007 press release about Mr. Fox:

> **Press release - Feb 2007**
> **• Nomination of President & CEO of PineApp Americas**
> PineApp is proud to announce the nomination of Mr. Jacob Fox to the position of President & CEO of PineApp Americas. Mr. Fox has been nominated to this position as part of the expansion of PineApp's distribution network and the development of new channels in the Americas. Mr. Fox has over 20 years of proven, successful experience in sales management, marketing, customer support and general management with market leading high tech companies. He has extensive business experience in the USA, Canada, Mexico, South America and Israel. Prior to PineApp, Mr. Fox was the VP of Sales for NICE Systems Inc. (NASDAQ::NICE), significantly

contributing to the company's rapid growth. Before NICE Systems, Mr. Fox held executive positions with Orbotech Inc. (NASDAQ::ORBK) and Digital Equipment Corporation (DEC) in Israel. In his different leadership roles Mr. Fox gained an extensive knowledge of Direct and Indirect market strategies and development & support of Channels and Partners.
Mr. Fox has a degree in Computer Engineering and Electronics

(http://www.pineapp.com/pressreleases.php).

99.  In or about March 2007, Jacob Fox sent a farewell email to NICE Systems employees.  In or about April 2007, NICE Systems held a farewell party for Mr. Fox at NICE Systems' New Jersey office.  NICE Systems did not do so for Messrs. O'Brien, Manning, Humblias and Feldman.  Unlike NICE Systems' treatment of Mr. Fox, NICE Systems immediately removed Plaintiffs from NICE Systems' premises and did so in a degrading and humiliating manner.

100. Based on NICE Systems' statement to Mr. O'Brien that NICE Systems was planning to discharge his employment for more than one year, several facts are clear.

101. It is clear that NICE Systems fraudulently gave Mr. O'Brien a "promotion" in 2006 solely to induce him to remain with NICE Systems and close lucrative deals for NICE Systems over the coming year, while NICE Systems simultaneously planned his unlawful termination.

102. It is also clear that NICE Systems fraudulently assigned Mr. O'Brien stock options in 2006, to induce him to remain with NICE Systems and close lucrative deals for NICE

-27-

Systems over the coming year, knowing that they were never going to allow him to vest in those options.

103. It is also clear that NICE Systems' actions were also intended to distract Mr. O'Brien from NICE Systems' ongoing unlawful conduct, so that NICE Systems could take steps to prepare to unlawfully fire him in January 2007 and prepare to reassign his numerous clients to Jewish and/or Israeli employees.

104. It is also clear that NICE Systems sent Mr. O'Brien to Las Vegas to pursue a substantial deal with Citigroup, knowing that Mr. O'Brien would never reap the benefits of that deal because he would be fired upon his return from the business trip.

105. Mr. Gorev, in attempting to cover-up NICE Systems' unlawful conduct, conveniently omitted the fact that at the time NICE Systems terminated Plaintiffs, NICE Systems also terminated Chuck Humblias and Tim Feldman, who were other salesmen on Plaintiffs' team that are non-Israeli and non-Jewish. Thus, NICE Systems was essentially engaging in a "house cleaning" of non-Jews and non-Israelis.

106. There are numerous facts, in addition to those set forth above, demonstrating Defendants' unlawful discrimination, harassment and retaliation against Plaintiffs.

107. For example, in or about 2004, NICE Systems directed Steve Bosco (non-Jewish, non-Israeli), to hire Alon Klomak (Jewish and/or Israeli) onto his team. NICE Systems retained Mr.

Bosco and terminated Mr. O'Brien because he refused to hire unqualified employees that are Jewish and/or Israeli, such as Mr. Klomak.

108. For example, in or about late 2006, NICE Systems promoted Mr. Klomak to Director of Distributor/Indirect Sales. NICE Systems knew that each Plaintiff was more qualified than Mr. Klomak for his position.  However, NICE Systems unlawfully denied each Plaintiff the position because of his race, color, national origin and religion/creed.

109. For example, at the time of Plaintiffs' termination, Mr. Manning complained to Mr. Gorev about the fact that NICE Systems had recently promoted Mr. Klomak, over whom Mr. Manning was more qualified, and was retaining him and discharging Mr. Manning.  Mr. Gorev said Mr. Manning was unqualified for Mr. Klomak's position, which was a lie.  Mr. Manning, like Mr. O'Brien, was more qualified than Mr. Klomak for Mr. Klomak's position.

110. NICE Systems retained and promoted Shachar Greenberg (Jewish and/or Israeli) from Presales Engineer to salesperson, because of his race, color, national origin and religion/creed. Mr. Greenberg effectively replaced Mr. O'Brien's terminated staff, including Mr. Manning, all of whom were more qualified than him. Mr. Manning was more qualified than Mr. Greenberg, but NICE Systems retained him and discharged Mr. Manning.

111. After NICE Systems unlawfully discharged Mr. O'Brien, and as a further act of discrimination and retaliation against Mr. O'Brien, NICE Systems filed a frivolous lawsuit against Mr. O'Brien, in New York, seeking to interfere with his subsequent employment ("NICE-O'Brien Lawsuit").  Just before an April 2007 Court date, NICE Systems withdrew the NICE-O'Brien Lawsuit because that lawsuit was frivolous.

112. Amy Fierstein is a current employee of NICE Systems and is Jewish.  After she joined NICE Systems, certain employees, including Bar Veinstein, referred to her and Maureen Dillon (another employee) as "Goyim."  Goyim is a Jewish/Yiddish word for non-Jews (Goy is the singular form of the word.).  At that time, those NICE Systems employees did not know that Ms. Fierstein is Jewish.  Ms. Fierstein told Mr. Veinstein that she is Jewish.  Mr. Veinstein is currently employed by NICE Systems as Director of Product Marketing.  Ms. Fierstein filed an affidavit with the EEOC in support of Mr. O'Brien's and Mr. Manning's EEOC Charges.  In addition, Ed Kawecki, a former NICE Systems employee, also filed an affidavit with the EEOC in support of Mr. O'Brien's and Mr. Manning's EEOC Charges.  NICE Systems subsequently sued Mr. Kawecki in federal court.

113. NICE Systems unlawfully discriminated against Plaintiffs, harassed them and unlawfully discharged them because of their race, color, national origin and religion/creed.  NICE

-30-

Systems retained numerous employees that were unqualified or less qualified than Plaintiffs, because those other employees are Jewish and/or Israeli. NICE Systems should have retained Plaintiffs ahead of all of those other employees, but unlawfully terminated their employment because of their race, color, national origin and religion/creed and because they opposed, objected to and/or complained about discrimination.

114. In addition, NICE Systems unlawfully discriminated against and unlawfully discharged each Plaintiff because of his age. As of January 10, 2007, Mr. O'Brien was 42 and Mr. Manning was 43. Upon information and belief, NICE Systems retained employees younger than Plaintiffs and less qualified than them.

115. For example, upon information and belief, NICE Systems assigned most of Mr. O'Brien's major accounts to Chris Daniels, Global VP (Jewish), who upon information and belief is younger than Mr. O'Brien, and who is less qualified than him.

116. In NICE Systems' position statement to EEOC, NICE Systems alleges, among other items, that "O'Brien and Manning were terminated in connection with a reorganization....The primary impetus for the reorganization was a decision by NICE Ltd." NICE Systems also alleges that "NICE Ltd., hired Daniels and made the decision to have Daniels assume direct responsibility" for Mr. O'Brien's accounts. Accordingly, NICE Systems has implicated NICE Systems Ltd. in the unlawful conduct.

117. For example, NICE Systems discriminated against Chuck Humblias because of his age.  During Plaintiffs' employment, they sought to hire Mr. Humblias because he was fully qualified.  Mr. Rozenblat said that NICE Systems could not hire Mr. Humblias because he was too old, arguing that if he was hired, NICE Systems would be unable to fire him because of his age.  NICE Systems later hired Mr. Humblias, but unlawfully refused to treat him as a W-2 employee and, instead, deemed him an independent contractor without any benefits, all because of his age.

118. In NICE Systems' EEOC position statement, NICE Systems argued for the very first time that Plaintiffs were terminated because of a restructuring and poor job performance.  NICE Systems' argument is false and, in fact, is belied by, among other items, Plaintiffs' records of outstanding job performance and NICE Systems' arguments in the NICE-O'Brien Lawsuit, in which NICE Systems alleged that Mr. O'Brien's separation was due solely to a restructuring and directly or indirectly praised him.

119. Plaintiffs opposed, objected to and complained of discrimination.

120. Defendants did not investigate and did not take appropriate remedial action in response to Plaintiffs' opposition to, objections to and/or complaints about unlawful discrimination and harassment, and failed to stop the unlawful conduct.

121. Defendants ignored Plaintiffs' opposition to,

objections to and/or complaints about unlawful discrimination and harassment and Defendants continued to engage in such unlawful conduct.  Defendants unlawfully retaliated against Plaintiffs for engaging in protected activity and opposing, objecting to and/or complaining about unlawful discrimination and harassment.

122. Defendants unlawfully discriminated against Plaintiffs, harassed Plaintiffs, and retaliated against Plaintiffs because of their race, color, national origin, religion/creed, and age.

123. Defendants' proferred reason for Plaintiffs' discharge is a pretext for unlawful discrimination and unlawful retaliation.

124. Defendants unlawfully discharged Plaintiffs because of their religion, creed, race, color, national origin and age, and Defendants' conduct constituted unlawful discrimination, harassment and retaliation.  Defendants' proferred reasons for the challenged conduct are a pretext for unlawful discrimination, harassment and unlawful retaliation.

125. Defendants' discrimination and harassment was severe and pervasive, adversely affected the terms, conditions and privileges of Plaintiffs' employment, resulted in adverse tangible employment actions, and created a hostile, offensive and abusive work environment.

126. Tolerance of discrimination and harassment was a term and condition of Plaintiffs' employment, Plaintiffs suffered

adverse tangible employment actions because they refused to acquiesce to that conduct and protested such conduct, and Plaintiffs were the victim of "quid pro quo" harassment.

127. Defendants' unlawful conduct was intentional and was carried out with malice or reckless indifference to Plaintiffs' protected rights to be free from unlawful discrimination, harassment and retaliation.

128. Defendants' proffered reason for its conduct was a pretext for unlawful discrimination and unlawful retaliation.

129. Defendants knew or should have known of the unlawful discrimination, unlawful harassment and unlawful retaliation against Plaintiffs, perpetrated, supported and condoned such unlawful conduct, and did nothing to stop such unlawful conduct, and that conduct continued.

130. Defendants' unlawful discrimination, unlawful harassment, and unlawful retaliation against Plaintiffs adversely affected the terms, conditions and privileges of their employment with Defendants.

131. Defendants authorized unlawful discrimination, unlawful harassment and unlawful retaliation against Plaintiffs and the employees who engaged in such unlawful conduct were unfit and Defendants were reckless and/or negligent in employing them.

132. Defendants failed to exercise reasonable care to prevent and correct unlawful discrimination, unlawful harassment

and unlawful retaliation against Plaintiffs and Defendants
ratified, approved, and/or condoned such unlawful conduct.

133. Upon information and belief: (a) Defendants
discriminated against and/or harassed other employees based on
their religion, creed, race, color, national origin and/or age;
(b) one or more other employees opposed, objected to and/or
complained about discrimination and/or harassment; and (c)
Defendants retaliated against one or more other employees who
objected to, opposed and/or complained about discrimination
and/or harassment.

134. As a result of Defendants' unlawful conduct, Plaintiffs
have suffered, and continue to suffer, among other items,
substantial damages.

135. As a result of Defendants' unlawful conduct, Plaintiffs
have suffered, and continue to suffer, among other items, injury,
impairment and damage to their good name and reputation,
emotional distress, mental anguish, emotional pain, suffering,
inconvenience, loss of enjoyment of life, and lasting
embarrassment and humiliation.

136. Defendants' unlawful conduct is continuing, and
Defendants are jointly and severally liable for the unlawful
conduct alleged herein.

137. Defendants have engaged in a pattern and practice of
unlawful discrimination, harassment, and retaliation.

138. Defendants are engaged in a continuing violation of law.

139. Since the termination of Plaintiffs' employment, Defendants have continued to discriminate against other non-Jewish and non-Israeli employees of the Company.

140. Plaintiffs are entitled to the relief sought herein.

## COUNT ONE

### (TITLE VII)

141. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 140 of this Complaint with the same force and effect as though fully set forth herein.

142. Each Defendant employs more than 15 employees.

143. At all relevant times, each Defendant was an "employer" within the meaning of Title VII.  42 U.S.C. § 2000e(b).

144. At all relevant times, each Plaintiff was an "employee" within the meaning of Title VII.  42 U.S.C. § 2000e(f).

145. Defendants' conduct, as alleged herein, constituted unlawful employment practices and unlawful discrimination on the basis of religion, creed, race, color and national origin, in violation of Title VII.  42 U.S.C. §§ 2000e, 2000e-2(a).

146. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of Title VII.  42 U.S.C. §§ 2000e, 2000e-3(a).

147. Defendants' conduct, as alleged herein, was carried out

-36-

with malice or reckless disregard for Plaintiffs' protected rights to be free from discrimination, harassment, and retaliation.

148. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

149. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Plaintiffs are entitled to recover damages for such injuries from Defendants under Title VII.

## COUNT TWO

### (SECTION 1981)

150. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 149 of this Complaint with the same force

and effect as though fully set forth herein.

151. Defendants' conduct, as alleged herein, constituted unlawful discrimination against Plaintiffs in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship," in violation of Section 1981.  42 U.S.C. § 1981.

152. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the Section 1981.  42 U.S.C. § 1981 et seq.

153. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiffs' rights to be free from discrimination and retaliation.

154. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs.  Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Section 1981.

155. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other

items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.  Plaintiffs are entitled to recover damages for such injuries from Defendants under Section 1981.

## COUNT THREE

### (NYSHRL)

156. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 155 of this Complaint with the same force and effect as though fully set forth herein.

157. At all relevant times, each Defendant was an "employer" within the meaning of the NYSHRL.  N.Y. Exec. Law § 292(5).

158. At all relevant times, each Plaintiff was an "employee" within the meaning of the NYSHRL, and a "person" within the meaning of the NYSHRL.  N.Y. Exec. Law §§ 292(1), 292(6).

159. Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of religion, creed, race, color, national origin and age, in violation of the NYSHRL.  N.Y. Exec. L. §§ 296, 296(1)(a).

160. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the NYSHRL.  N.Y. Exec. L. §§ 296, 296(1)(e), 296(3-a)(c), 296(7).

161. Each Defendant is liable for the unlawful conduct herein both as an "employer" under NYSHRL § 296(1) and under the "aiding and abetting" provision of NYSHRL § 296(6). N.Y. Exec. L. §§ 292, 292(1), 292(5), 292(6), 296, 296(1), 296(1)(a), 296(1)(e), 296(3-a)(c), 296(6), 296(7).

162. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, from Defendants under the NYSHRL.

163. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation. Plaintiffs are entitled to recover damages for such injuries from Defendants under the NYSHRL.

## COUNT FOUR

### (NYCHRL)

164. Plaintiffs repeat and reallege every allegation in

-40-

paragraphs 1 through 163 of this Complaint with the same force and effect as though fully set forth herein.

165. At all relevant times herein, each Defendant was an "employer", "covered entity" and a "person" within the meaning of the NYCHRL. N.Y.C. Admin. Code §§ 8-102, 8-102(1), 8-102(5), 8-102(17), 8-107, 8-107(1).

166. At all relevant times herein, each Plaintiff was a "person" within the meaning of the NYCHRL. N.Y.C. Admin. Code §§ 8-102, 8-102(1).

167. Defendants' conduct, as alleged herein, constituted "unlawful discriminatory practices" and unlawful discrimination on the basis of race, color, national origin and age, in violation of the NYCHRL. N.Y.C. Admin. Code §§ 8-107, 8-107(1)(a).

168. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the NYCHRL. N.Y.C. Admin. Code §§ 8-107, 8-107(7).

169. Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiffs' protected rights to be free from discrimination and harassment, and retaliation.

170. Each Defendant is liable for the unlawful conduct herein both as an "employer" under NYCHRL § 107(1) and under the "aiding and abetting" provision of NYCHRL § 8-107(6). N.Y.C.

Admin. Code §§ 8-102, 8-102(1), 8-102(5), 8-102(17), 8-107, 8-107(1)(a), 8-107(6), 8-107(7).

171. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs.

172. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.  Plaintiffs are entitled to recover damages for such injuries from Defendants under the NYCHRL.

173. Plaintiffs are entitled to recover monetary damages and other damages and relief, punitive damages, interest, and attorneys' fees and costs from Defendants under the NYCHRL.

## COUNT FIVE

### (ADEA)

174. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 173 of this Complaint with the same force

and effect as though fully set forth herein.

175. At all relevant times, each Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

176. At all relevant times, each Plaintiff was a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

177. Defendants' conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of age, in violation of the ADEA.  See, e.g., 29 U.S.C. §§ 623, 623(a).

178. Defendants' conduct, as alleged herein, constituted unlawful retaliation in violation of the ADEA.  See, e.g., 29 U.S.C. §§ 623, 623(d).

179. Defendants' unlawful conduct, as alleged herein, was willful within the meaning of the ADEA.  See, e.g., 29 U.S.C. §§ 626, 626(b).

180. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs.  Plaintiff are entitled to recover such monetary and other damages, liquidated damages, interest, and attorneys' fees and costs, from Defendants, under the ADEA.

## COUNT SIX

### (NJLAD)

181. Plaintiffs repeat and reallege every allegation in paragraphs 1 through 180 of this Complaint with the same force and effect as though fully set forth herein.

182. At all relevant times, each Plaintiff and each Defendant was a "person" within the meaning of the NJLAD.

183. At all relevant times, each Defendant was and is an "employer" within the meaning of the NJLAD.

184. At all relevant times, each Plaintiff was an "employee" within the meaning of the NJLAD.

185. Defendants committed unlawful employment practices and discriminated against Plaintiffs and unlawfully discharged Plaintiffs because of their religion, creed, race, color and national origin, regarding compensation, terms, conditions and privileges of employment, and employment opportunities.

186. Defendants' conduct, as alleged herein, constituted unlawful employment practices and unlawful discrimination on the basis of religion, creed, race, color and national origin, in violation of the NJLAD.

187. Defendants actually participated in the unlawful employment practices and unlawful discrimination alleged herein and/or were willfully indifferent to it.

188. Defendants aided, abetted, incited, compelled and/or

coerced the doing of the unlawful employment practices and unlawful discrimination alleged herein, or attempted to do so.

189. Defendants acted with actual malice and/or a wanton and willful disregard of persons who foreseeably might be harmed.

190. Defendants' unlawful employment practices and unlawful discrimination and unlawful retaliation against Plaintiffs has been continuous.

191. Each Plaintiff opposed, objected to and complained about Defendants' unlawful employment practices and unlawful discrimination.

192. Plaintiffs' conduct, as alleged herein, constituted protected activities within the meaning of the NJLAD.

193. Defendants unlawfully retaliated and took reprisals against Plaintiffs regarding compensation, terms, conditions and privileges of employment, and employment opportunities, because Plaintiffs engaged in protected activity under the NJLAD.

194. Defendants unlawfully coerced, intimidated, threatened and/or interfered with Plaintiff in the exercise and/or enjoyment of rights granted to Plaintiffs under the NJLAD and rights protected by the NJLAD.

195. Defendants' conduct, as alleged herein, constituted unlawful retaliation and unlawful reprisals, in violation of the NJLAD.

196. Defendants actually participated in the unlawful

retaliation and unlawful reprisals alleged herein and/or were willfully indifferent to it.

197. Defendants aided, abetted, incited, compelled and/or coerced the doing of the unlawful retaliation and unlawful reprisals alleged herein, or attempted to do so.

198. Defendants acted with actual malice and/or a wanton and willful disregard of persons who foreseeably might be harmed.

199. Defendants' unlawful retaliation and unlawful reprisals against Plaintiffs has been continuous and is continuing.

200. As a result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer injury, with resulting monetary and other damages, including without limitation lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost 401(k) and retirement earnings, lost vacation, personal and sick days, lost interest and attorneys' fees and costs.  Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under the NJLAD.

201. As a further result of Defendants' unlawful conduct, each Plaintiff has suffered and continues to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, and lasting embarrassment and humiliation.  Plaintiffs are entitled to

recover damages for such injuries from Defendants under the NJLAD.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

(A)  On Count One, enter a judgment declaring the acts and practices of Defendants to be in violation of Title VII, see, e.g., 42 U.S.C. § 2000e-5(g);

(B)  On Count One, award each Plaintiff as against Defendants the amount of wages, including without limitation back pay, front pay, bonuses, benefits, 401(k) and retirement earnings, the value of vacation, personal and sick days, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with Title VII, see, e.g., 42 U.S.C. § 2000e-5(g);

(C)  On Count One, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with Title VII, see, e.g., 42 U.S.C. § 2000e-5(g);

(D)  On Count One, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment

and humiliation, and other pecuniary and nonpecuniary losses, in accordance with Title VII, see, e.g., 42 U.S.C. § 1981a;

(E)  On Count One, award each Plaintiff as against Defendants punitive damages, in accordance with Title VII, see, e.g., 42 U.S.C. § 1981a;

(F)  On Count One, award each Plaintiff as against Defendants the cost of this action, together with reasonable attorneys' fees, in accordance with Title VII, see, e.g., 42 U.S.C. § 2000e-5(k);

(G)  On Count Two, enter a judgment declaring the acts and practices of Defendants to be in violation of Section 1981, 42 U.S.C. § 1981 et seq.;

(H)  On Count Two, award each Plaintiff as against Defendants the amount of wages, including without limitation back pay, front pay, bonuses, benefits, 401(k) and retirement earnings, the value of vacation, personal and sick days, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with Section 1981, 42 U.S.C. § 1981 et seq.;

(I)  On Count Two, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with Section 1981, 42 U.S.C. § 1981 et seq.;

(J)  On Count Two, award each Plaintiff as against
Defendants compensatory damages for, among other items, injury,
impairment and damage to his good name and reputation, emotional
distress, mental anguish, emotional pain, suffering,
inconvenience, loss of enjoyment of life, lasting embarrassment
and humiliation, and other pecuniary and nonpecuniary losses, in
accordance with Section 1981, 42 U.S.C. § 1981 et seq.;

(K)  On Count Two, award each Plaintiff as against
Defendants punitive damages, in accordance with Section 1981, 42
U.S.C. § 1981 et seq;

(L)  On Count Two, award each Plaintiff as against
Defendants the cost of this action, together with reasonable
attorneys' fees, in accordance with Section 1981, 42 U.S.C. §
1988 (b);

(M)  On Count Three, enter a judgment declaring the acts and
practices of Defendants to be in violation of the NYSHRL, see,
e.g., N.Y. Exec. L. § 297(9);

(N)  On Count Three, award each Plaintiff as against
Defendants the amount of wages, including without limitation back
pay, front pay, bonuses, benefits, 401(k) and retirement
earnings, the value of vacation, personal and sick days, and
interest lost as a result of Defendants' unlawful discrimination,
unlawful harassment and unlawful retaliation, in accordance with
the NYSHRL, see, e.g., N.Y. Exec. L. § 297(9);

(O)  On Count Three, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with the NYSHRL, <u>see, e.g.</u>, N.Y. Exec. L. § 297(9);

(P)  On Count Three, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses, in accordance with the NYSHRL, <u>see, e.g.</u>, N.Y. Exec. L. § 297(9);

(Q)  On Count Four, enter a judgment declaring the acts and practices of Defendants to be in violation of the NYCHRL, <u>see, e.g.</u>, N.Y.C. Admin. Code § 8-502;

(R)  On Count Four, award each Plaintiff as against Defendants the amount of wages, including without limitation back pay, front pay, bonuses, benefits, 401(k) and retirement earnings, the value of vacation, personal and sick days, and interest lost as a result of Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with the NYCHRL, <u>see, e.g.</u>, N.Y.C. Admin. Code § 8-502;

(S)  On Count Four, award each Plaintiff as against Defendants consequential damages for losses resulting from

Defendants' unlawful discrimination, unlawful harassment and
unlawful retaliation, in accordance with the NYCHRL, see, e.g.,
N.Y.C. Admin. Code § 8-502;

(T)  On Count Four, award each Plaintiff as against
Defendants compensatory damages for, among other items, injury,
impairment and damage to his good name and reputation, emotional
distress, mental anguish, emotional pain, suffering,
inconvenience, loss of enjoyment of life, lasting embarrassment
and humiliation, and other pecuniary and nonpecuniary losses, in
accordance with the NYCHRL, see, e.g., N.Y.C. Admin. Code § 8-
502;

(U)  On Count Four, award each Plaintiff as against
Defendants punitive damages, in accordance with the NYCHRL, see,
e.g., N.Y.C. Admin. Code § 8-502;

(V)  On Count Four, award each Plaintiff as against
Defendants the cost of this action, together with reasonable
attorneys' fees, in accordance with the NYCHRL, see, e.g., N.Y.C.
Admin. Code § 8-502;

(W)  On Count Five, enter a judgment declaring the acts and
practices of Defendants to be in violation of the ADEA, see,
e.g., 29 U.S.C. §§ 216(b), 623, 626(b) to (d);

(X)  On Count Five, award each Plaintiff as against
Defendants the amount of wages, including without limitation back
pay, front pay, bonuses, benefits, 401(k) and retirement

earnings, the value of vacation, personal and sick days, and
interest lost as a result of Defendants' unlawful discrimination,
unlawful harassment and unlawful retaliation, in accordance with
the ADEA, see, e.g., 29 U.S.C. §§ 216(b), 623, 626(b) to (d);

(Y)  On Count Five, award each Plaintiff as against
Defendants consequential damages for losses resulting from
Defendants' unlawful discrimination, unlawful harassment and
unlawful retaliation, in accordance with the ADEA, see, e.g., 29
U.S.C. §§ 216(b), 623, 626(b) to (d);

(Z)  On Count Five, award each Plaintiff as against
Defendants liquidated damages, in accordance with the ADEA, 29
U.S.C. §§ 216(b), 623, 626(b) to (d);

(AA) On Count Five, award each Plaintiff as against
Defendants the cost of this action, together with reasonable
attorneys' fees, in accordance with the ADEA, see, e.g., 29
U.S.C. §§ 216(b), 623, 626(b) to (d);

(BB) On Count Six, enter a judgment declaring the acts and
practices of Defendants to be in violation of the NJLAD;

(CC) On Count Six, award each Plaintiff as against
Defendants the amount of wages, including without limitation back
pay, front pay, bonuses, benefits, 401(k) and retirement
earnings, the value of vacation, personal and sick days, and
interest lost as a result of Defendants' unlawful discrimination,
unlawful harassment and unlawful retaliation, in accordance with

the NJLAD;

(DD) On Count Six, award each Plaintiff as against Defendants consequential damages for losses resulting from Defendants' unlawful discrimination, unlawful harassment and unlawful retaliation, in accordance with the NJLAD;

(EE) On Count Six, award each Plaintiff as against Defendants compensatory damages for, among other items, injury, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and other pecuniary and nonpecuniary losses, in accordance with the NJLAD;

(FF) On Count Six, award each Plaintiff as against Defendants punitive damages, in accordance with the NJLAD;

(GG) On Count Six, award each Plaintiff as against Defendants the cost of this action, together with reasonable attorneys' fees, in accordance with the NJLAD;

(HH) On Counts One through Six, and if and only if Plaintiffs are not awarded front pay, then award Plaintiffs reinstatement in accordance with applicable law; and

(II) Grant each Plaintiff such other and further relief as may be necessary and proper.

<u>**JURY DEMAND**</u>

Plaintiffs demand a jury trial for all issues triable.

-53-

Dated:    New York, New York
           October 26, 2007

                       GOLDBERG & FLIEGEL LLP

By:   /s/ Kenneth A. Goldberg
        Kenneth A. Goldberg (KG 0295)
        60 East 42nd Street, Suite 3421
        New York, New York 10165
        (212) 983-1077
        Attorneys for Plaintiffs